**UNITED STATES of America, Plaintiff,**

v.

**JERRY PAUL C. (a juvenile), Defendant.**

**Criminal No. 96–108 BB.**

United States District Court,
D. New Mexico.

June 10, 1996.

John J. Kelly, U.S. Attorney, Norman Bay, Ass't U.S. Attorney, Albuquerque, NM, for Plaintiff.

Reginald Storment, Albuquerque, NM, for Defendant.

### MEMORANDUM OPINION AND ORDER

BLACK, District Judge.

THIS MATTER is before the Court on the Motion of the United States of America ("Government") to Transfer Proceedings Against the Juvenile, Jerry Paul C., to Adult Criminal Prosecution. The Court having read all the briefs of counsel and considered the testimony and exhibits presented, finds, with reservations, the motion is supported by the law and must be GRANTED.

### Discussion

■ The Government files its motion to transfer Jerry Paul C. to be tried as an adult pursuant to 18 U.S.C. § 5032. This statute is based on historical antecedents for dealing with juveniles committing crimes under traditional notions of delinquency and is constructed "around a philosophy of rehabilitation." Maj. Richard L. Palmatier, Jr., *Criminal Offenses by Juveniles on the Federal Installation: A Primer on 18 U.S.C. § 5032,* 1994 Army Law. 3 (1994). These remedial procedures must rehabilitate the juvenile so that he can be released on or before his twenty-first birthday in most cases. *United States v. A.W.J.,* 804 F.2d 492 (8th Cir.1986). The jurisdictional basis of this claim, a Native American committing crimes on the reservation, raises a troubling question.

■ The problem, so graphically portrayed by this case, is that the snare of federal sentences under the United States Sentencing Commission Guidelines catches only a small class of individuals: those who voluntarily enter federal enclaves and facilities, or Native Americans. *See* Palmatier, *supra* at 3. Significantly, "[m]uch of the federal case law deals with incidents occurring on Indian reservations." *See, e.g., United States v. Juvenile Male,* 864 F.2d 641 (9th Cir.1988); *United States v. Dennison,* 652 F.Supp. 211 (D.N.M.1986); *United States v. Means,* 575 F.Supp. 1068 (D.S.D.1983); *United States v. E.K.,* 471 F.Supp. 924 (D.Or. 1979). *Cf.* Placido G. Gomez, *The Dilemma of Difference: Race as a Sentencing Factor,* 24 Golden Gate U.L.Rev. 357, 376 (1994) (recognizing cases involving Native Americans present unique sentencing problems for federal courts). If juveniles are transferred and tried as adults in state courts, state criminal sentences on average tend to be shorter, often with greater allowances for "good time" and parole, than federal sen-

tences. Eric B. Levine, *Two Views of Offender Characteristics: A Comparative Look at the Federal Sentencing Guidelines and the New Jersey Sentencing Statutes*, 4 Seton Hall Const.L.J. 661, 662 n. 14 (1994); Robert P. Crouch, Jr., *Uncertain Guideposts on the Road to Criminal Justice Reform; Parole Abolition and Truth–In–Sentencing*, 2 Va. J.Soc.Pol'y & L. 419 (1995); *see also* Symposium, Violent Crime Control & Law Enforcement Act of 1994, 20 U.Day.L.Rev. 763, 766 (1995) ("Only the federal government and a few states require that criminals serve at least eighty-five percent of the imposed sentences.") Indian juveniles, therefore, face disproportionate consequences because transfer to adult status in the federal system exposes them to far graver consequences than their non-Indian counterparts transferred for adult prosecution in the state system. This is especially ironic as one of the goals of the Federal Sentencing Guidelines was to address the fact that several earlier studies showed minority defendants received longer sentences than their White counterparts. Elizabeth T. Lear, *Is Conviction Irrelevant?*, 40 U.C.L.A.L.Rev. 1179, 1189–90 (1993)

The handling of the state action involved in the same "night of terror" that brings this juvenile, Jerry Paul C., before this Court highlights the problem. Jerry Paul C. was convicted and sentenced as an adult on two counts of armed robbery with a firearm enhancement; conspiracy to commit armed robbery; and false imprisonment. He was sentenced to a prison term of ten years (one hundred twenty months). Under the Federal Sentencing Guidelines, he would have been subject to a sentence of approximately eighty-seven to one hundred and eight months, plus sixty consecutive months for use of a firearm during a crime of violence. In addition to the fact Jerry Paul C. was subject to a lesser sentence in the State system, at the time of his convictions the State of New Mexico allowed those serving "adult time" to earn good time credits at the rate of thirty days for every month served. NMSA 1978 § 33–2–34 (1990 Repl.Pamp.). Good time in the federal system is limited to fifty-four days per year. The effect, of course, is that Indian youths tried as adults

in the federal system serve a substantially larger percentage of their originally longer sentences than non-Indian youths tried as adults in the State courts.

■ In spite of what appears to be a very disparate impact on those, mostly Indian, juveniles who are subject to the jurisdiction of the federal criminal system, this Court is obligated to follow federal law and deal with Jerry Paul C. under the six factors enumerated in 18 U.S.C. § 5032. The Court analyzes the six factors required by § 5032 as follows:

### 1. Age and Social Background

Jerry Paul C. is an enrolled member of the Acoma Pueblo. His mother was fifteen when he was born. Jerry was raised by his maternal grandparents and actually thought his mother was his sister until he was twelve. He never knew his father although he believes his father resides somewhere near the Pueblo where he was raised. He was not a problem until he entered high school. As he got older, Jerry began to violate his curfew, left the house without permission, and skipped school on a regular basis. He also became disrespectful of his elders, increasingly using obscene language toward all authority figures. Along with the adult defendant in this case, Jerry was an admitted member of the "South Side Locos" gang. He was age fifteen at the time of the incident.

The Court finds his age weighs against transferring Jerry to adult status, but the other factors tilt in favor of transfer. *Compare, United States v. M.L.*, 811 F.Supp. 491 (C.D.Cal.1992) (sixteen year old with supportive family background and no prior record not transferred on murder charge).

### 2. Nature of the Offense

On July 30, 1995, the victim, William Anthony Morris, had hitched a ride outside of Albuquerque. Around 8:00 PM, just outside of Grants, New Mexico, the truck in which Morris was riding broke down on Interstate–40. The owner of the truck went to Grants to get help. He returned but was unable to fix the truck. The truck owner then told Morris that he could stay with the truck or

he could hitchhike on to California, his ultimate destination. The owner left and Morris stayed in the truck.

At about this same time, Jerry and two friends, ages 18 and 14, approached Henry Sanchez who was using a phone in front of a convenience store, pointed a rifle in his face, and directed him to a nearby field. Sanchez was tied and gagged, and the three took his keys and his car. They then entered the convenience store, threatened the clerks with their firearms, and robbed the store. The three left the store but were unable to start Sanchez's car. Jerry fired a shotgun as they left.

The three began walking towards Acoma. They came upon the Dodge pickup truck parked on the shoulder of Interstate–40. Morris was asleep inside. The 18–year–old urged Jerry to "f--- him [Morris] up." Jerry fired the shotgun once at Morris's head. When investigators asked Jerry how he knew Morris had been shot, Jerry said that he looked inside and saw blood on the window. When asked what he did next, Jerry said he reloaded and shot the victim a second time. When asked why he shot a second time, he said that Morris was flopping around and screaming. When Jerry was asked if he fired a third shot, as indicated by the evidence, he said he could not remember, but that he shot the victim until he was dead.

This factor weighs very heavily in favor of a transfer. *United States v. One Juvenile Male*, 40 F.3d 841 (6th Cir.1994); *United States v. Hemmer*, 729 F.2d 10 (1st Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. H.M.M.S.*, 838 F.Supp. 30 (D.P.R.1993).

### 3. *Prior Delinquency Record*

Although he was but fifteen at the time of the murder, Jerry had compiled a serious criminal record.

#### a. *Tribal Charges*

On October 22, 1993, an Acoma tribal police officer stopped a vehicle driven by Jerry. When Jerry got out, he put some things underneath the vehicle, including two nine millimeter clips with fourteen rounds of live ammunition in each clip. Nine days later, Jerry was found walking along the roadway after curfew. An Acoma tribal police officer stopped and asked if he wanted a ride. Prior to allowing Jerry to get into the vehicle, the officer conducted a pat down and found numerous miniature bottles of alcohol. The officer suspected that the alcohol was taken during the burglary of a liquor store a few days earlier. Jerry was charged with a curfew violation and possession of alcohol.

On November 3, 1993, tribal authorities issued an arrest warrant for Jerry Paul C. The warrant alleged a firearm violation, intoxication, and assault and battery. Tribal authorities also filed a Petition for Commitment. The Petition noted, "The said minor child is considered by his parents as threats to them. . . . The Social Service caseworker is investigating elderly abuse."

In an attempt at rehabilitation, Jerry was sent to the Santo Domingo Ke–Wa House. While at the Ke–Wa House, Jerry received both individual and group counseling with a licensed clinical psychologist. He was identified as a child in need of supervision, education, and treatment of alcohol abuse. The Ke–Wa House staff identified problems with his behavior and attitude. However, before a treatment plan for Jerry could be developed, he stole the Ke–Wa House van and fled.

#### b. *State Charges*

On September 30, 1994, Cibola County authorities filed a seventeen-count petition against Jerry Paul C. The petition charged him with committing multiple commercial burglaries in Grants, New Mexico.

On October 3, 1994, Cibola County authorities filed a second petition against Jerry Paul C. This petition charged him with a February 19, 1994, burglary in which Jerry stole three semi-automatic firearms, as well as with shoplifting two bottles of liquor.

In December 1994, the New Mexico State court sentenced him to two years confinement at the New Mexico Boy's School in Springer. While in the high security unit at Springer, Jerry was engaged in what was characterized as a "riot" and which was ap-

parently premised on the hope of escape. The Government also presented testimony that while at Springer, Jerry refused to take his prescribed psychotropic medications.

After the occurrence of the events involved in this case, Jerry Paul C. pled guilty in State court to two counts of armed robbery with a firearm enhancement, conspiracy to commit armed robbery, and false imprisonment based on his involvement in the convenience store robbery. He was sentenced as an adult to ten years incarceration. The State court found that Jerry had a previous juvenile record and a history of drug and alcohol abuse; that the offenses were crimes of violence; and that he was "not amenable to treatment or rehabilitation in available facilities."

Additionally, Jerry has apparently been involved in and also the victim of drive-by shootings. These incidents appear to arise, at least in part, out of his gang affiliation. At the hearing in this matter, however, Jerry testified he no longer belonged to the South Side Locos.

This factor augers in favor of transfer. *United States v. Bilbo,* 19 F.3d 912, 916 (5th Cir.1994); *United States v. M.L.,* 811 F.Supp. at 491.

### 4. *Present Intellectual Development and Maturity*

Jerry Paul C. was last enrolled in the ninth grade. At that time, he was below average or failing most of his classes because of his failure to attend school. Earlier records indicated that Jerry was an average student. The Government presented testimony that he had dropped out of the GED program at the Southern New Mexico Correctional Facility where he is serving his ten-year state sentence. Jerry testified he was unable to participate in the program because it conflicted with his work assignment and the infirmary failed to provide him excused absences when appropriate.

The Court also heard fairly extensive testimony from psychologists presented by both the Government and Jerry Paul C. The Government sponsored David C. Miller, Ph.D., Director of Treatment Services at the New Mexico juvenile facility at Springer. Dr. Miller testified that based on his observations, Jerry was antisocial, had little regard for the rights of others, and was resistant to authority. He traced this to lack of appropriate handling during early childhood. It was Dr. Miller's opinion that Jerry's "conduct disorder" had remained fairly consistent and become internalized.

The Government also submitted a psychological report which concluded that in light of Jerry's long history of threats and physical aggression, both to strangers and family members, he posed a serious risk of becoming a repeat offender. It also concluded he was not amenable to treatment.

Counsel for Jerry Paul C. presented Robert Colby, M.A., who had interviewed and tested Jerry on two occasions and who earlier testified in favor of a juvenile sentence in the State court proceedings. He testified Jerry has at least average intelligence but in Colby's opinion had not been exposed to adequate attempts at rehabilitation in either the state or tribal systems. It was his opinion that no adult had ever established appropriate limits during Jerry's early life so that Jerry never learned to respect adult authority. He acknowledged that Jerry had a conduct disorder and needed treatment for drug and alcohol abuse in a secure facility. He also conceded that on the day of the murder if Jerry indeed heard a voice telling him to "hurt White people," he was very dangerous; at least on that day. Robert Colby further testified that Jerry's incarceration at the Southern New Mexico Correctional Facility had produced a sobering effect. This appears to be substantiated by Jerry's participation in a "scared straight" type program with local youthful offenders.

This factor is evenly balanced.

### 5. *The Nature of Past Treatment Efforts and the Defendant's Response to Such Efforts*

As outlined above, the only real intervention and treatment efforts have been resisted by Jerry Paul C. He took the Ke–Wa House van and fled the facility. At Springer, Dr. Miller testified he resisted authority and refused to take his medication. As noted earli-

er, Jerry was also a prime participant in a major disturbance. Robert Colby, however, was critical of the lack of any meaningful "rehabilitation" provided at these facilities.

The Court must conclude this factor weighs slightly in favor of transfer. *United States v. A.W.J.*, 804 F.2d at 492; *United States v. J.D.*, 525 F.Supp. 107 (S.D.N.Y. 1981).

### 6. *Availability of Programs*

The final factor the Court must consider is the availability of programs designed to treat the juvenile's behavioral problems. Little evidence was presented on this topic. Robert Colby testified he had determined there were facilities which in his opinion could provide Jerry rehabilitative counseling designed specifically for Native American youth. Unfortunately, he knew nothing about whether Jerry would be eligible for any or all of these programs given his age and relatively violent history. Jerry's mandatory incarceration in a State prison until after he has turned twenty-one casts further uncertainty on any such prospects.

The Court does not have enough information to intelligently attribute any real significance to this factor in this case.

### *Conclusion*

■ The Federal Juvenile Delinquency Act is designed to " 'remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation.' " *One Juvenile Male*, 40 F.3d at 844 (quoting *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir.1990)). Jerry Paul C. has already been imprinted with the stigma of "adult criminal" in the State court, and this Court's ability to effect adequate treatment and rehabilitation before his twenty-first birthday is highly doubtful given his ten-year state sentence. *See, United States v. Alexander*, 695 F.2d 398, 401 (9th Cir.1982) ("more than a glimmer of hope of rehabilitation" is necessary). Moreover, the Court must balance this priority with the need to protect the public from violent and dangerous individuals. *Bilbo*, 19 F.3d at 916. "[A] motion to transfer is properly granted where

a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. T.F.F.*, 55 F.3d 1118, 1121 (6th Cir.1995) (quoting *One Juvenile Male*, 40 F.3d at 844).

In this case, the Court must conclude that Jerry Paul C. will remain a risk to society. This may subject him to a very long, federal prison term on top of his prior state sentence. In this case, the possibility of a disproportionately long, federal prison sentence is largely the unfortunate product of Jerry Paul C.'s jurisdictional status as a Native American.

Now therefore,

**IT IS ORDERED** that the Government's *Motion to Proceed Against Juvenile as Adult* be and hereby is GRANTED; that these records and all further proceedings shall be transferred to the regular criminal division of this court; and that the Government may proceed against Jerry Paul C. as an adult.