**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 22 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

LEON, D.M.,

      Defendant-Appellee.

No. 97-2000

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-96-301-BB)

Louis E. Valencia, Assistant United States Attorney; John J. Kelly, United States Attorney, with him on the brief, Albuquerque, New Mexico, for Plaintiff-Appellant.

Jerry A. Walz; Walz and Associates, Albuquerque, New Mexico, for Defendant-Appellee.

Before TACHA, HENRY, and LUCERO, Circuit Judges.

HENRY, Circuit Judge.

The United States brings this interlocutory appeal challenging the denial of its motion to transfer the defendant-appellee Leon D.M. to adult status. Applying the collateral order doctrine established in Cohen v. Beneficial Indus. Loan Corp., 337 U.S.

541 (1949), we first conclude that we have jurisdiction to consider this appeal.  On the merits, we hold that the district court did not abuse its discretion in denying the government's motion to transfer and therefore affirm its decision.


## I.  BACKGROUND

In May 1996, the United States Attorney for the district of New Mexico filed an information alleging that, on November 16, 1995, Leon  D.M. killed Johnny D.C., Jr., a two- year, eleven-month-old boy, within the boundaries of the San Juan Indian Reservation.  At the time of the alleged offense,  Leon was seventeen years, nine months old.  After filing the information, the government moved to proceed against Leon as an adult pursuant to 18 U.S.C. § 5032.

The evidence introduced at the hearing on the government's motion indicated that Leon was a poor student who dropped out of high school at fifteen.  In the summer of 1993, he met Charmain Chavez, a twenty-five-year-old woman with three children from a previous marriage: an eight-year-old boy, a five-year-old girl, and Johnny D.C., Jr., who was born on December 29, 1992.   Shortly after he met her, Leon moved in with Ms. Chavez and her children.  In September 1995, when Leon was seventeen, he and Ms. Chavez had a son.

Ms. Chavez and Leon first lived with his mother in Chimayo, New Mexico.  They later moved to his grandparents house in Truchas, New Mexico and then to Ms. Chavez's

2

house on the San Juan Pueblo Reservation. When they lived in Chimayo, Leon worked at a nursing home as a cook. After the move to the reservation, he stayed home to care for the children while Ms. Chavez worked at the Eight Northern Indian Pueblos Council. Ms. Chavez, Leon's mother, and a high school friend all testified at the evidentiary hearing that Leon was never violent or abusive with Ms. Chavez's three children or with his infant son. According to his mother, Leon took good care of Johnny, getting up in the middle of the night to feed and change him. All of these witnesses characterized Leon as of average intelligence and noted that he enjoyed working on cars. Ms. Chavez said that he was mature.

On November 16, 1995, Leon called Ms. Chavez at work and told her that she should come home because Johnny had fallen off his tricycle and needed to be taken to the hospital. When she arrived at home, she found Johnny in the bedroom. His clothes were wet and he was unresponsive. Ms. Chavez noticed a large bump on his head. Leon told Ms. Chavez that after Johnny had fallen down, he had tried to administer cardio-pulmonary resuscitation and, when that did not work, had placed Johnny in the shower in order to revive him. Ms. Chavez and Leon took Johnny to the hospital, where he died.

At the evidentiary hearing, the government presented testimony from Dr. Eugene Zumwalt, a forensic pathologist who served as the Chief Medical Investigator for the State of New Mexico and who supervised Johnny's autopsy. Dr. Zumwalt testified that the autopsy revealed multiple external bruises on the child's head, neck, back, chest,

3

abdomen, buttocks, right knee, shins, and feet. Further examination revealed extensive internal bleeding in the brain, a complex skull fracture, a hemorrhage in the left eye, bruises around the optic nerves, a laceration of the frenulum, a broken vertebrae, and a tear in the mesentery (the tissue that attaches the bowel to the back of the abdomen). According to Dr. Zumwalt, Johnny's injuries were inconsistent with Leon's account of a single fall from a tricycle. He concluded that Johnny died from multiple blunt force injuries that were probably inflicted at the same time.

On cross-examination, Dr. Zumwalt acknowledged that the injuries were consistent with "single episode fatal abuse," which means that "a child who is fatally abused . . . . [m]ay have multiple injuries , but all the injuries are consistent with having occurred at or about the same time with one episode of injury." Rec. vol. II, at 111 (Tr. of Evidentiary Hr'g dated Oct. 9, 1996). He added this kind of abuse could be committed by individuals lacking sufficient parenting skills who are overwhelmed by their family responsibilities. Id. at 111-12.

The government also introduced evidence regarding prior acts of abuse. An FBI agent testified that Ms. Chavez's daughter had told him that Leon would occasionally force-feed Johnny. Additionally, two neighbors informed law enforcement agents that that they had observed Leon violently shaking the boy. These witnesses stated that they had told Leon to stop and that he had complied.

4

Johnny's father then testified that he suspected Leon of abusing his son, stating that on several occasions he had noticed bruises on his son's chin. When Johnny, Jr. was hospitalized for a viral infection in February 1995, he said, he reported these observations to medical personnel, but they told him that the bruises were caused by the infection. From February 1995 until his son's death in November, Johnny's father added, he had discovered no additional bruises. He also testified that Leon appeared to him to be a violent person, threatening him and his family several times and once actually throwing a punch at him.

Finally, the government offered evidence regarding the lack of treatment programs for individuals like Leon. Dr. David Miller, a forensic psychologist and Acting Deputy Superintendent of the New Mexico Boys School, testified there were no programs or juvenile facilities available within the State of New Mexico for violent offenders of Leon's age. Dr. Miller listed three reasons for the lack of such programs: the violent nature of the crime, Leon's age, and overcrowding at the New Mexico facilities.

After hearing all the evidence, the district court took the case under advisement. The court requested both the government and counsel for Leon to present additional information regarding out-of-state facilities that accepted violent juvenile offenders and that had educational and treatment programs. Both parties complied, and their submissions revealed several out-of-state facilities accepting individuals over eighteen who had committed violent crimes before their eighteenth birthday and providing

5

education and treatment programs for them.  See Rec. vol. I, docs. 44, 45.  After the hearing, Leon's counsel also submitted the results of a Wechsler Adult Intelligence Scale, administered to him in October 1996, that estimated Leon's mental age at 14.4 years.  See id. doc. 47.

In November 1996, after the hearing and after reviewing the information regarding out-of-state programs, the district court entered an order denying the government's motion to transfer Leon to adult status.  See id. doc. 48.  The court considered the six factors listed in 18 U.S.C. § 5032 as relevant to the decision regarding transfer: (1) Leon's  age and social background; (2) the nature of the alleged offense; (3) his prior delinquency record; (4) his present intellectual development and psychological maturity; (5) the nature of past treatment efforts and his response to those efforts; and (6) the availability of programs designed to treat his behavioral problems.

The court found two factors favoring a transfer to adult status.  First, the court noted that Leon was almost eighteen at the time of the alleged offense, and this fact favored treating him as an adult.  Second, the court concluded that the heinous nature of the alleged offense also favored transfer.  See id. at 3-4.

However, the court also identified several factors supporting Leon's contention that he should be treated as a juvenile.  First, Leon's social background indicated that he was an immature teenager whose relationship with Ms. Chavez and her children had thrust him into an adult role that he did not understand and for which he was inadequately

6

prepared. Second, even with regard to the nature of the offense, there were some characteristics that supported juvenile adjudication. The court cited Dr. Zumwalt's testimony that "under the pressure of caring for four younger children, an immature teenager could easily lose his temper and react with violence." Id. at 4.

The court also discussed Leon's prior delinquency record. It observed that he had been convicted in the San Juan Tribal Court of several offenses (malicious mischief, disorderly conduct, and a minor drug violation) and had been ordered to pay a $100.00 fine for each charge. He was also cited for contempt when he failed to pay these fines. There was also testimony from several witnesses at the evidentiary hearing that Leon used marijuana. However, the court characterized Leon's record as "relatively insignificant." Id. at 5. As to Leon's intellectual development and psychological maturity, the court concluded that he was a slow learner with limited intellectual ability and that this factor also weighed against transfer to adult status.

Finally, the court considered the prospects of effectively treating Leon. It noted that he had received no prior treatment whatsoever and concluded that this factor favored retention of juvenile status. The court then cited the supplemental evidence provided by both parties indicating that several out-of-state facilities could provide education and treatment for Leon.

In light of all these factors, the district court concluded that Leon should be retained in juvenile status:

7

Defendant was an immature, undereducated teenager who left home at fifteen and found himself in a very demanding family situation. He had not previously demonstrated any violent or dangerous traits. To the contrary, most of the testimony was that Defendant generally attempted to avoid confrontation. Thus, there appears little chance that Defendant will be a danger to society and there appears to be good chance he can be rehabilitated to become a useful member of society. The congressional history of Section 5032 indicates that Defendant should retain juvenile status unless the Court finds there is no reasonable prospect of rehabilitation before his twenty-first birthday. In this case, the Court finds Leon D.M. has a reasonable prospect for rehabilitation before his twenty-first birthday.

Id. at 7-8 (citation omitted).

The government then moved for reconsideration, arguing that it had been afforded no opportunity to respond to the results of the intelligence test and that the court should order Leon to submit to a full psychological evaluation. See Rec. vol. I, doc 51. The district court denied the government's request, reasoning that the intelligence test was "far from dispositive." See Rec vol. I, doc. 54 at 2. The court added that "[u]pon a proper showing, the Court could yet be persuaded to reopen the record to accept any such evidence available to the parties." Id. n.1.

## II. DISCUSSION

On appeal, the government contends that the district court erred in denying its motion to transfer Leon to adult status. Leon first responds that we lack jurisdiction over this appeal because the district court's decision constitutes an interlocutory order. He also

8

argues that the district court's decision to maintain his juvenile status is supported by the record. We begin with the jurisdictional question.

## A. Jurisdiction

Because it does not finally resolve all of the issues in the case, the district court's decision denying the government's motion to transfer constitutes an interlocutory order. See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1541-42 (10th Cir.) (discussing the principle that interlocutory orders are usually not immediately appealable), cert. denied, 117 S. Ct. 297 (1996). Generally, such orders may not be reviewed until the district court enters a final judgment that conclusively resolves all of the issues in the case. See id. However, in Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541 (1949), the Supreme Court established an an exception to that general rule, holding that in interlocutory orders that possess the following characteristics may be appealed before the entry of final judgment: (1) the order must "'conclusively determine the disputed question[;]'" (2) it must "'resolve an important issue completely separate from the merits of the action[;]'" and (3) it must be "'effectively unreviewable on appeal from a final judgment.'" Midland Asphalt Corp. v. United States, 489 U.S. 794, 799 (1989) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)). In the instant case, the government contends that the district court's order denying its motion to transfer meets these requirements and that, as a result, this court now has jurisdiction to review it.

In United States v. Angelo D., 88 F.3d 856, 857-59 (10th Cir. 1996), we applied the Cohen collateral order doctrine to a juvenile's appeal of a district court order granting the government's motion to transfer to adult status. We noted that every circuit that has addressed the question had concluded that an order transferring a juvenile to adult status is immediately appealable under the collateral order doctrine. See id. at 858 n.1 (citing United States v. J.J.K., 76 F.3d 870, 871-72 (7th Cir. 1996); United States v. Doe, 49 F.3d 859, 865 (2d Cir. 1995); United States v. One Juvenile Male, 40 F.3d 841, 844 (6th Cir. 1994); United States v. A.R., 38 F.2d 699, 701 (3d Cir. 1994); United States v. Bilbo, 19 F.3d 912, 914-15 (5th Cir. 1994); United States v. Gerald N., 900 F.2d 189, 190 (9th Cir. 1990); In re Sealed Case, 893 F.2d 363, 368 (D.C. Cir. 1990); United States v. Smith, 851 F.2d 706, 708 (4th Cir. 1988); United States v. A.W.J., 804 F.2d 492, 492-93 (8th Cir. 1986); United States v. C.G., 736 F.2d 1474, 1476-77 (11th Cir. 1984)). We agreed with these circuits and held that the district court's order satisfied the Cohen requirements such that we had jurisdiction over the appeal.

We reasoned that the first two Cohen factors were clearly present--"[t]he transfer order conclusively determines whether the defendant is to be tried as an adult or a juvenile and resolves an important issue separate from whether the juvenile is innocent or guilty of the current charges." Angelo D., 88 F.3d at 858. We recognized that the third Cohen factor-- whether the transfer order would be effectively unreviewable from a final judgment--raised "a closer question." Id. However, noting that the purpose of the

10

Federal Juvenile Delinquency Act is to "'remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation,'" id. (quoting United States v. Brian N., 900 F.2d 218, 220 (10th Cir. 1990)), we concluded that a juvenile would lose the legal and practical benefits afforded by the Act if he or she were forced to wait until after a final judgment to appeal an order of transfer to adult status. See id. (citing Doe, 49 F.3d at 865).

In arguing that we lack jurisdiction to consider the government's appeal in the instant case, Leon contends that Angelo D is distinguishable because that case involved an appeal by a juvenile of a district court decision granting a motion to transfer to adult status rather than an appeal by the government of decision denying a motion to transfer. Leon contends that when the government seeks to appeal the denial of its motion to transfer, the third Cohen element is not satisfied. According to Leon, there is no right that will be irretrievably lost if the government is required to wait until the entry of a final judgment to file an appeal.

Although the Tenth Circuit has not yet reached the question of whether the government may immediately appeal the denial of a motion to transfer a juvenile to adult status under the Cohen collateral order doctrine, the Second and Ninth Circuits have both concluded that the government may pursue such an appeal. See United States v. Doe, 94 F.3d 532, 535 (9th Cir. 1996); United States v. Juvenile Male No. 1, 47 F.3d 68, 70-71 (2d Cir. 1995). In Doe, the Ninth Circuit concluded that the first two Cohen elements

11

were clearly satisfied. See Doe, 94 F.3d at 535 ("The district court's order denying the government's motion conclusively determines the disputed question, that is, whether the defendant will be tried as an adult, and this is is completely separate from the merits of defendant's guilt or innocence."). As to the third Cohen element, the Ninth Circuit noted that if the government were forced to wait until the conclusion of the juvenile adjudication to appeal the district court's denial of its motion to transfer, "the government's right to try [the] defendant as an adult would be forever barred by the Double Jeopardy Clause." Id. at 535 (citing Breed v. Jones, 421 U.S. 519, 541 (1975)); see also Juvenile Male No. 1, 47 F.3d at 70-71 (concluding that the court of appeals has jurisdiction to consider the government's appeal of an interlocutory order denying its motion to transfer to adult status); United States v. David H., 29 F.3d 489, 491 n.2 (9th Cir. 1994) (per curiam) (same).

We are persuaded by the reasoning of these decisions. As we have previously observed, the purpose of the federal statutes concerning juveniles is to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." Brian N., 900 F.2d at 220. "[T]his purpose must be balanced . . . against the need to protect the public from 'violent and dangerous individuals and providing sanctions for antisocial acts.'" One Juvenile Male, 40 F.3d at 844 (quoting United States v. Alexander, 695 F.2d 398, 401 (9th Cir. 1982) (quoting United States v. E. K., 471 F. Supp. 924, 932 (D. Ore. 1979))). The

12

government thus has an important interest in trying as adults those individuals under the age of eighteen who meet the standards for adult status under the Federal Delinquency Act. See 18 U.S.C. § 5032 (listing the factors to be considered in deciding whether to transfer juveniles to adult status). Because the Double Jeopardy Clause prohibits a second prosecution for the same offense, United States v. Hawley, 93 F.3d 682, 687 (10th Cir. 1996), the government will forever lose the opportunity to try a particular defendant as an adult if it cannot immediately appeal the denial of a motion to transfer. Accordingly, we conclude that under the Cohen collateral order doctrine, we have jurisdiction to consider this appeal.

## B. The Denial of the Motion to Transfer

On the merits, the government contends that the district court erred in applying 18 U.S.C. § 5032 to deny its motion to transfer Leon D.M. to adult status. According to the government, the evidence in the record establishes that juvenile adjudication is unwarranted.

Section 5032 of Title 18 provides that proceedings may not be brought in federal court against juveniles for offenses committed within the territorial jurisdiction of the United States unless the Attorney General certifies to the appropriate district court that there is a substantial federal interest in the case warranting the exercise of federal jurisdiction and that one of the following factors exists: (1) the state juvenile court does

not have or refuses to assume jurisdiction; (2) the state does not have available programs and services adequate for the needs of juveniles; or (3) the alleged offense is a felony that is a crime of violence, a violation of section 401 of the Controlled Substances Act (21 U.S.C. § 841), a violation of certain sections of the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951-971, or a violation of certain sections of title 18 of the United States Code (18 U.S.C. §§ 922(x), 924(b), (g), or (h)). Section 5032 further provides that with respect to a juvenile fifteen years or older alleged to have committed an act after his fifteenth birthday which constitutes a crime of violence or a violation of the specified drug laws, "criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, [that] such transfer would be in the interest of justice." The statute then sets forth six factors that the court must consider:

> Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: [1] the age and social background of the juvenile; [2] the nature of the alleged offense; [3] the extent and nature of the juvenile's prior delinquency record; [4] the juvenile's present intellectual development and psychological maturity; [5] the nature of past treatment efforts and the juvenile's response to such efforts; [6] the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C. § 5032.

Under § 5032, juvenile adjudication is presumed appropriate, and the government bears the burden of establishing that a transfer to adult status is warranted. United States

14

v. Nelson, 68 F.3d 583, 588 (2d Cir. 1995); Juvenile Male No. 1, 47 F.3d at 71; A.R., 38 F.3d at 706 (3d Cir. 1994). Additionally, although the district court must consider each of the six factors set forth in the statute, it is not required to give equal weight to each factor but "may balance them as it deems appropriate." Juvenile Male No. 1, 47 F.3d at 71; see also United States v. Doe, 871 F.2d 1248, 1254-55 (5th Cir. 1989) ("A court is certainly not required to weigh all statutory factors equally."). Also, the court is not required to state whether each specific factor favors or disfavors transfer. United States v. Three Male Juveniles, 49 F.3d 1058, 1061 (5th Cir. 1995). However, in making the transfer decision, the court may assume the truth of the government's allegations regarding the defendant's commission of charged crime. See Doe, 871 F.2d at 1250 n.1.

Appellate review of § 5032 transfer decisions is quite deferential. These decisions are reviewed for an abuse of discretion, and, as the Second Circuit has noted, an appellant bears "a heavy burden" in seeking to overturn them. See Juvenile Male No. 1, 47 F.3d at 71. A district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the required factual findings or when its factual findings are clearly erroneous. See id. However, the district court's decision should not be overturned simply because an appellate court could have reached a different conclusion had it considered the matter in the first instance. See id.

In this case, the government contends that the district court erred in denying its motion to transfer because each of the six statutory factors indicates that juvenile

15

adjudication is unwarranted. It begins with Leon's age and social background, noting that, when the alleged murder was committed, only three months remained until his eighteenth birthday and that the record contains no evidence that Leon had an unstable home life or suffered abuse or neglect. Thus, according to the government, the first § 5032 factor supports treating Leon D.M. as an adult.

The government advances similar arguments with regard to the second and third factors. It points to the heinousness of the alleged offense--the brutal murder of a young child in the defendant's care. With regard to Leon's prior delinquency record, the government cites testimony of the neighbors who observed Leon shaking Johnny and of Johnny's father, who suspected Leon of abusing his son. It also notes testimony about Leon's marijuana use (including evidence that he tested positive for marijuana during the pendency of this case) and his tribal court convictions for malicious mischief, disorderly conduct, and a minor drug violation. The government maintains that this evidence establishes a record of delinquency warranting a transfer to adult status.

As to the fourth factor, Leon's intellectual development and psychological maturity, the government cites the testimony of Ms. Chavez, Leon's mother, and Leon's high school friend that he was mature, associated with older friends, and cared for Mr. Chavez's children and his own son. The government also points to evidence that Leon has some mechanical skills.

16

Finally, the government challenges the district court's reasoning regarding the fifth and sixth statutory factors, the nature of past treatment efforts and the availability of programs designed to treat the juvenile's behavioral problems. It observes that there is no indication that Leon received any psychological treatment in the past and points to the fact that no psychological evaluation was performed on Leon after the filing of the murder charge. As a result, the government argues, the district court was unable to make a reliable assessment of Leon's behavioral problems or of the prospects of treating these problems at any particular facility. The government also cites Leon's marijuana use during the pendency of this case as evidence of a lack of desire to be rehabilitated.

In our view, in advancing these arguments on appeal, the government seeks mainly to re-argue its motion to transfer, asking us to re-weigh the six statutory factors such that we reach a different result than did the district court. We have little doubt, as the government forcefully contends, that some of those factors (particularly Leon's age and the heinousness of the alleged offense) provide support for treating him as an adult. However the evidence in the record as to several of the other factors (particularly Leon's intellectual development and psychological maturity and the availability of treatment programs) may be reasonably interpreted to support treating Leon as a juvenile.

As the arguments of the parties illustrate, many of the statutory factors leave considerable room for interpretation. For example, the proper measure of intellectual development and psychological maturity is open to debate, and neither § 5032 nor the

17

case law interpreting it specifies how these characteristics should be assessed in a particular juvenile. The statute thus vests considerable discretion in the district court to decide, based on the evidence presented to it, whether a particular behavior (e.g., dropping out of school and beginning a sexual relationship with an older woman, as Leon did) reflects intellectual development and psychological maturity or a lack of these characteristics. Here, the record establishes that the district court carefully considered each of the statutory factors and made a difficult decision as to how to weigh them. Even if the decision might not have been our own, in light of the deference we afford the district court, it must stand.

We agree with the government that a psychological evaluation of Leon may have been helpful in deciding its motion to transfer. However, as Leon notes, it is the government's burden to prove that such a transfer is warranted. Here, the government did not seek a psychological evaluation until after the conclusion of the evidentiary hearing on its motion and the issuance of the district court's ruling. Moreover, although it may well have been helpful in this case, § 5032 does not require a psychological evaluation before the district court may decide a transfer motion. Therefore, in light of the government's delayed request, the district court did not err in deciding the government's motion without the benefit of such an evaluation.

Accordingly, we conclude that the district court did not abuse its discretion in denying the government's motion to transfer Leon D.M. to adult status.

18

## III. CONCLUSION

For the reasons set forth above, we conclude that we have jurisdiction to consider the government's appeal of the district court's interlocutory order denying its motion to transfer Leon D.M. to adult status. On the merits, we AFFIRM the district court's decision denying the government's motion to transfer.