**UNITED STATES of America, Plaintiff,**

v.

**ANTHONY Y. (a juvenile), and Severiano B. (a juvenile), Defendants.**

**No. CR 96–748 JP.**

United States District Court,
D. New Mexico.

Jan. 23, 1998.

Phillip Patrick Medrano, Albuquerque, NM, for Anthony Y.

Joe M. Romero, Jr., Albuquerque, NM, Joseph N. Riggs, III, Albuquerque, NM, for Severiano B.

Louis Valencia, U.S. Attorney's Office District of New Mexico, Albuquerque, NM, for U.S.

### MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subjects of this Memorandum Opinion and Order are the two "Motion[s] to Proceed against Juvenile as an Adult" (Docs. No. 8 & 9), filed December 23, 1996. On October 29, 30, and 31, 1997, I held an evidentiary hearing on the motions. Louis Valencia represented the United States; Philip Medrano represented Anthony Y., who was present; Joseph Riggs represented Severiano B, who was present. At the conclusion of the United States' presentation of evidence relating to Severiano, I stated findings of fact in the record, as required by 18 U.S.C. § 5032, and announced my decision that the transfer of Severiano to adult status would not be in the interest of justice. I, therefore, denied the United States' motion as it pertained to Severiano. After presentation of all of the evidence, I took the United States' motion to transfer Anthony Y. under advisement and ordered the parties to submit supplemental briefs, which they have done. Having thoroughly considered the law, facts, pleadings, and arguments of counsel I now conclude, with reservations, that transferring Anthony to adult status "would be in the interest of justice." 18 U.S.C. § 5032.

### Evidentiary Issue

■ At the transfer hearing, counsel for Anthony objected to the admission of Plaintiff's Exhibit 1, Anthony's Juvenile Records from the Shiprock Family Court. Counsel objected on hearsay and due process grounds, contending that Anthony was being denied the opportunity to cross-examine the individuals who prepared the documents. I granted counsel's request that I defer ruling on his objection until after he had an opportunity to examine the records in greater detail. Counsel never mentioned his objection again although he had ample time to study the records. For that reason, I find that he withdrew his objection. However, even if counsel had reasserted the objection after reviewing the records, I still would admit the exhibit over the objection. The Federal Rules of Evidence do not apply to transfer hearings. *Government of Virgin Islands in Interest of A.M.*, 34 F.3d 153, 160–62 (3rd Cir.1994); *United States v. Doe*, 871 F.2d 1248, 1255 (5th Cir.), *cert. denied*, 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989). Thus, any hearsay objection is without merit. Similarly, in the context of this transfer proceeding, Anthony's due process argument is not valid. Anthony's claim of a due process violation simply amounts to an objection to the use of hearsay which, as just mentioned, is admissible. Additionally, the records contained in Plaintiff's Exhibit 1 were considered and relied upon by Anthony's expert witness, Dr. Roger Enfield, who testified at the transfer hearing. Moreover, the Tribal Court records have an aura of trustworthiness. Exhibit 1 will be admitted over Anthony's objection.

### Background

This case involves the murders of two men, Gary Wayne Adams, 57, and his son, Gary Douglas Adams, 28.[1] Both Anthony and

---

1. For purposes of the transfer hearing, I may assume that the facts alleged by the United States

Severiano are charged with two counts of felony murder, in violation of 18 U.S.C, § 1111, three counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), and one count of interference with commerce by threat or violence, in violation of 18 U.S.C. § 1951. Both juveniles are also charged as aiders and abettors on each count under 18 U.S.C. § 2.

On December 12, 1996, the Navajo Department of Law Enforcement ("NDLE") received a call from KLLM Transport Services. KLLM reported that it monitored the progress of its tractor-trailer rigs through the use of a satellite tracking system and that the truck being driven by the Adamses had remained stationary since the night before. An NDLE officer was dispatched and discovered the truck parked off to the side of U.S. Highway 666. The officer discovered drag marks in the dirt leading from the area beside the truck towards a fence line. At the fence, the officer found the body of Gary Wayne Adams. The body of Gary Douglas Adams was later discovered inside the cab of the truck. Both men had been shot to death.

As alleged by the United States, late in the evening of December 11, 1996, Anthony went to Severiano's house in Shiprock, New Mexico and asked Severiano if he wanted to "jack some people." Severiano later explained that "to jack" someone meant to beat and possibly rob him. Severiano agreed to jack some people and left his house with Anthony to accomplish that aim. Severiano took with him a weight lifting bar to use as a weapon and Anthony took with him a baseball bat and a gun. At some point prior to the killings, Anthony and Severiano consumed a quart of malt liquor and smoked marijuana. Anthony supplied the malt liquor.

Late in the evening of December 11, 1996, or in the early morning hours of December 12, 1996, Anthony and Severiano caught a ride to U.S. Highway 666 where they were dropped off. They walked south along U.S. 666 and as they approached the Adams' truck, parked beside the highway, Anthony got ahead of Severiano. When Anthony reached the truck, he appeared to have a discussion with Gary Wayne Adams, who was

sitting in the passenger's seat. While standing on the ground beside the truck, Anthony pulled out his gun and fired at Gary Wayne Adams, who slumped in his seat. Anthony fired again and Gary Wayne Adams slid out of the truck and grabbed onto the side rail for support. Anthony fired yet again and Gary Wayne Adams fell to the ground. After slaying Gary Wayne Adams, Anthony then shot at Gary Douglas Adams, who had emerged from the truck's sleeper compartment. Anthony then climbed into the truck and fired again. Anthony shot each victim in his head, multiple times, at close range. Neither victim provoked his murder.

Next, Anthony and Severiano dragged Gary Wayne Adams' body to the fence line and rummaged through his pockets, stealing about $11.00. They returned to the truck and Severiano took a knife he found in the cab. Severiano then kicked Gary Douglas Adams' body to see if he was dead. Anthony tried to drive the vehicle away but was unsuccessful. One of the juveniles went through Gary Douglas Adams' pockets and stole $8.00 or $9.00. Anthony and Severiano also stole a TV/VCR unit, a cellular phone, and a case of candy. They then headed towards home on foot.

While returning home, one of the juveniles dropped the TV/VCR unit and it broke. They hid most of the candy bars and the cellular phone and returned home.

The evening of December 12, 1996, Edmund Joe Bidtah informed law enforcement officers that Anthony had admitted to him that he had killed the two men. Mr. Bidtah related that Anthony had stated that one of the two men in the truck had come after him with a bat, that Anthony had shot him, and he then had gotten "trigger happy" and had shot the other man. No one in the group with Mr. Bidtah believed the story so Anthony led them to the scene of the crimes and showed the group the body of Gary Wayne Adams lying near the fence. Anthony told at least three other versions of the homicides to different people.

concerning Anthony's and Severiano's roles in the alleged crimes are true. *United States v.*

*Leon D.M.,* 132 F.3d 583, 589–90 (10th Cir. 1997).

Mr. Bidtah also reported that on December 12, 1996, Severiano had asked Mr. Bidtah for a ride and directed him to a wash near a canal. Severiano left the vehicle and returned with three boxes of Snickers bars and a duffle bag. Snickers was the type of candy that the Adamses had been transporting.

The weapon used in the killings was found where Severiano had told law enforcement it was located—behind Severiano's house.

Anthony was arrested on December 14, 1996 and Severiano was arrested on December 15, 1996.

*Transfer Analysis*

The United States filed its motion to transfer Severiano and Anthony to adult status under 18 U.S.C. § 5032. If transferred to adult status, Severiano and Anthony would lose the protections afforded juveniles under various federal statutes. "[T]he purpose of the federal statutes concerning juveniles is to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation. This purpose must be balanced ... against the need to protect the public from violent and dangerous individuals and providing sanctions for antisocial acts." *United States v. Leon D.M.*, 132 F.3d 583, 588–89 (10th Cir.1997) (internal quotation marks and citations omitted).

Unfortunately, as cogently noted by United States District Judge Bruce Black in *United States v. Jerry Paul C.*, 929 F.Supp. 1406, 1407–08 (D.N.M.1996), Native American juveniles in New Mexico who commit crimes in Indian Country and who are transferred to adult status in federal court face much longer terms of incarceration than do juveniles who are prosecuted in the New Mexico state court system. The disproportionate sentences for Native American youth discussed by Judge Black deeply trouble me, especially when I consider that any transfer to adult status should be "in the interest of justice." 18 U.S.C. § 5032. Nevertheless, I must apply the Juvenile Delinquency Act as Congress has written it, balancing the six factors set out in 18 U.S.C. § 5032.

**Severiano B.**

■ As I stated on the record, I concluded that a transfer of Severiano to adult status would not be in the interest of justice based on the following factors:

1. *Age and Social Background:* Severiano B., a Navajo male born October 7, 1980, had turned 16 years of age about two months before the killings. Because, generally, only juveniles 15 to 18 years of age are eligible for transfer to adult status,[2] Severiano's young age favors retaining juvenile status. Likewise, Severiano's social background favors retaining juvenile status because he has a supportive extended family, evidenced by frequent family visits while Severiano was in custody, by many family members being present in court during the transfer hearing, and by information contained in the record concerning his relationships with family members.

2. *Nature of the Alleged Offense and Severiano's Role:* This factor favors transfer to adult status. "[I]n making the transfer decision, the court may assume the truth of the government's allegations regarding the defendant's commission of [the] charged crime." *Leon D.M.*, 132 F.3d 583, 589–90. The two murders with which Severiano is charged are horrendous crimes. Severiano's level of participation in the homicides was, however, not great. He did not personally shoot the two victims nor did he encourage their deaths. The evidence suggests that Severiano did not expect Anthony to kill anyone and was bewildered by the fact that he ended up being present at the scene of murders. Severiano did not play a leadership role in planning criminal activity that led to the murders. However, he did go along willingly with Anthony's plan "to jack" someone and Severiano's activities at the scene following the killings by Anthony were sickening.

3. *Extent and Nature of Prior Delinquency Record:* Severiano does have a prior delinquency record but it is not extensive either in length or frequency. On August 16, 1996 he was charged with a curfew violation

---

**2.** Under 18 U.S.C. § 5032 some children as young as 13 years of age are eligible for transfer to adult status.

because he had been found by Tribal authorities at 2:30 a.m. on July 28, 1996 in the parking lot of the Northern Navajo Medical Center without adult supervision. Severiano was placed in a deferred prosecution program with participation by his parents. This was Severiano's only official involvement with the juvenile justice system prior to December 12, 1996. However, during his incarceration since the murders, Severiano has admitted that he previously broke into and entered abandoned housing and that he was suspected of being involved in a burglary. Severiano's prior record is devoid of violence. This factor favors retaining juvenile status.

4. *Present Intellectual Development and Psychological Maturity:* Severiano's intelligent quotient is in the low average range. There were indications of immaturity before the murders, but a showing of maturity and an ability to make good choices about his life while he has been incarcerated. This factor favors retaining juvenile status.

5. *Past Treatment Efforts and Response to such Efforts:* There is no indication of any treatment of significance prior to Severiano's detention. However, he has had treatment since April of 1997, while incarcerated, to which he has responded favorably. Additionally, in the opinion of Dr. Jean Hill, the United States' expert witness, Severiano likely will respond favorably to further treatment in a structured setting. This factor favors retaining juvenile status.

6. *Availability of Appropriate Programs:* Dr. Hill described appropriate programs for Severiano as those treating substance abuse, and educational and occupational programs occurring in a structured environment. I took judicial notice that there are such programs available, based on my having required juveniles to participate in such programs in the past. This factor favors retaining juvenile status.

After balancing these six factors, I concluded that the interests of justice did not support transferring Severiano to adult status. The only factor supporting transfer, the horrible nature of the alleged offenses, was somewhat tempered by the comparatively smaller role Severiano played in the offenses. As a result, I denied the United States' motion to transfer Severiano to adult status.

**Anthony Y.**

■ 1. *Age and Social Background:* Anthony, a Navajo male born November 10, 1981, was just one month past his fifteenth birthday when the killings occurred. This strongly supports retaining juvenile status.

Anthony's social background, however, favors transferring him to adult status.

The United States' expert, Dr. Jean Hill, testified that Anthony's parents, who were separated and in the process of obtaining a divorce when she interviewed Anthony, had been inconsistent in their enforcement of rules Anthony was to follow. Anthony's mother testified that Anthony would not obey her. However, she also said that she did not discipline him when he violated parental rules, such as a curfew. According to his mother, Anthony just would not listen to her. Anthony's mother also testified that she sometimes failed to attend Anthony's counseling sessions because she forgot about them.

Anthony's father testified that he was not around to help raise Anthony between 1988 and 1990. He also testified that when he was present in the household he was unable to impose discipline because Anthony threatened that, if disciplined, he would tell his teachers that he was being abused. On one occasion, Anthony's father got into a scuffle with Anthony and threatened to strike him with a television set.

Thomas Bryant, the principal at Anthony's middle school testified that Anthony's father had said that he just did not know what to do with Anthony from which Mr. Bryant inferred that Anthony would not obey his parents.

The social background of an unstable and unsupportive family environment, as exists here, favors transfer to adult status. It is difficult to reach the goal of the juvenile justice system "to encourage treatment and rehabilitation," *Leon D.M.,* 132 F.3d 583, 588–89, without familial support. This conclusion is supported by the testimony of Dr. Roger Enfield, Anthony's expert. Dr. Enfield opined that one of the reasons juveniles become recidivists is because, while still young upon release from juvenile custody

and treatment, they return to the same home environments in which they originally became law breakers. Under these circumstances, they often revert to their prior anti-social behavior.

2. *Nature of the Alleged Offense and Anthony's Role:* As discussed above, the alleged offenses were horrific. Anthony played a major leadership role. 18 U.S.C. § 5032 explicitly requires a judge "[i]n considering the nature of the offense" to take into account "the extent to which the juvenile played a leadership role ... or otherwise influenced other persons to take part in criminal activities involving the use ... of ... firearms." Anthony went to Severiano's home and enlisted Severiano to help Anthony "jack" someone. Anthony supplied the malt liquor they drank. Without provocation and without prompting or encouragement by Severiano, Anthony slew both victims with a firearm. This factor weighs heavily in favor of transfer to adult status.

3. *Extent and Nature of Prior Delinquency Record:* Anthony has a long history of getting into trouble. For example, he frequently got into fights, abused drugs, and missed school. He was caught carrying a weapon, a sharpened screwdriver, on school grounds. He physically assaulted his counselor, Dr. Laura Burnett. He broke windows and flattened tires in his neighborhood. He was found running around an apartment complex using a can of hair spray as a torch. He reported to Dr. Hill that he abused cats. Just one or two days after committing the murders, shortly before being arrested for the crimes, Anthony hit a teenager, Terrance Cambridge, over the head with a bottle. The attack rendered Mr. Cambridge unconscious, broke his nose, and required his hospitalization. While in detention on the charges in this case, Anthony has been involved in shoving incidents, has possessed a toothbrush sharpened into a weapon, and has been found in unauthorized areas. Anthony's extensive record at such a young age, which includes considerable violence, weighs in favor of transfer to adult status.

4. *Present Intellectual Development and Psychological Maturity:* Anthony functions at a low average level of intelligence. He is immature and self-centered. He has low self-esteem. Prior to the murders, he was in a class for severely emotionally disturbed children. He was not performing well in school. It is apparent that there is significant room for him to develop intellectually and mature psychologically. This factor leans in favor of retaining juvenile status.

5. *Past Treatment Efforts and Response to such Efforts:* Anthony has been subjected to numerous efforts to treat him but, unfortunately, they have been unsuccessful. For example, in the class for severely emotionally disturbed children, Anthony received an abundance of individual attention. It appears, though, that some of this individual attention was negative and counterproductive in that one of the teacher's aides used his position of authority to bait Anthony into outbursts. This, obviously, could not have helped Anthony. For whatever reasons, Anthony has continuously resisted efforts to treat him. In June, 1996 a Navajo Nation social worker reported Anthony's very serious misconduct to the Tribal Family Court and recommended that Anthony be committed to Halverson House, a residential treatment facility. Halverson House would not accept Anthony, however, because Anthony threatened to run away if he were to be placed there. Anthony frequently missed his counseling sessions, even those that were scheduled during the school day at Anthony's school. Moreover, Anthony assaulted his counselor, Dr. Burnett, in the school hallway and stole some items from Dr. Burnett's office.

Dr. Enfield recognized that Anthony's past treatment had been unsuccessful. He testified that the treatment efforts were doomed to fail because they were inappropriate for someone with Anthony's makeup.

Anthony was afforded opportunities to take advantage of numerous forms of treatment, but he refused to participate with sincerity in receiving treatment. This is counterbalanced by Dr. Enfield's opinion that the treatment offered Anthony was simply of the wrong type. Hence, this factor neither favors transfer nor militates against it.

6. *Availability of Appropriate Programs:* According to Dr. Hill, Anthony is beyond being helped and, therefore, there are no appropriate programs available to treat him.

Dr. Enfield testified that Anthony was amenable to treatment and that if he were to be placed in a secure facility with appropriate, structured programs, he could be treated successfully before reaching 21 years of age. Dr. Enfield testified that such facilities exist. Because of the divergent, credible views of the experts, this factor weighs neither in favor of nor against transfer.

After thoroughly considering and balancing the factors specified in 18 U.S.C. § 5032, I conclude that transferring Anthony to adult status "would be in the interest of justice."

IT IS THEREFORE ORDERED that.

1. Plaintiff's Exhibit 1 is admitted over objection;

2. The United States' motion to transfer Severiano B. to adult status is DENIED; and

3. The United States' motion to transfer Anthony Y. to adult status is GRANTED, and the United States may proceed against Anthony Y. as an adult.