JOSEPH F. BIANCO, United States District Judge
On July 10, 2017, the government filed a Juvenile Information against defendant Juvenile Male ("the defendant"),[1] charging him with one count of racketeering by engaging in conspiracy to murder and murder, 18 U.S.C. § 1962(c) ; one count of racketeering conspiracy, 18 U.S.C. § 1962(d) ; one count of conspiracy to murder rival gang members, 18 U.S.C. § 1959(a)(5) ; and four counts of murder, 18 U.S.C. §§ 2, 1959(a)(1). These charges relate to the alleged murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos in a wooded area near the Central Islip Recreational Center in Central Islip, New York on April 11, 2017 ("the April 11 murders").
Before the Court is the government's motion under 18 U.S.C. § 5032 to transfer the case to district court in order to prosecute the defendant as an adult. On July 19, 2018, after receiving written submissions from the parties, the Court held a hearing on the motion. This Memorandum and Order contains the Court's findings under 18 U.S.C. § 5032.
*577 After carefully analyzing the required statutory factors, the Court concludes in its discretion that, notwithstanding the statutory presumption in favor of juvenile adjudication, the government has rebutted that presumption and met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted. In particular, as discussed in detail below, although the defendant's age at the time of the offense (fifteen years, eleven months) and some other factors weigh against transfer, the balancing of all the statutory factors clearly supports transfer of the defendant to adult status in the interest of justice.
First, the nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult. The defendant is charged with actively participating in four brutal murders for La Mara Salvatrucha, a violent street gang also known as the MS-13. The defendant's alleged participation in this premeditated, brutal execution of four young victims, by itself, warrants giving more weight to this factor than any other factor. However, the defendant's alleged extensive role in the crime makes this factor even more compelling in this case. The government asserts that the defendant was motivated to commit the murders in order to elevate his status in the gang and that he had the following alleged role: (1) the defendant participated in multiple meetings where the plan was discussed and designed in the weeks leading up to the murders; (2) on the day of the murders, the defendant communicated with two juvenile females, who were luring the intended victims into the woods where gang members were lying in wait to carry out the murders; (3) in this pivotal role, the defendant passed along updates to his fellow gang members as to the location and estimated arrival time of the victims; and (4) when the victims arrived, the defendant (using a machete) and his fellow gang members brutally attacked and killed the four victims. A defendant who is alleged to have actively participated in these murders in this depraved, premeditated way is extremely violent and dangerous to society, and is unlikely to be rehabilitated within the juvenile justice system, especially given the limited sentencing options available in that system if the defendant were found guilty (such as the statutory maximum of five years' incarceration). In short, in the Court's view, given the gravity of the alleged crimes and the defendant's alleged extensive role in these crimes, this is the most critical factor in this particular analysis and is a compelling factor in favor of transfer.
Second, although the defendant was under sixteen at the time of the offense, other aspects of the second factor-the defendant's age and social background-favor transfer. The defendant had the benefit of a supportive family in El Salvador, as well as the United States (where he lived with his mother). According to the defendant's own expert (Dr. Eric Goldsmith), he became disobedient in El Salvador and began interacting with MS-13 gang members. In fact, the defendant was sent to the United States for the specific reason of preventing him from joining the gang. Nevertheless, upon arriving to the United States, he rejected the support structure his mother tried to provide, and instead almost immediately chose to become a member of the MS-13 gang, with full knowledge of its violent nature and mission. In addition, the defendant is now seventeen years old and is close to the age of maturity, which weighs slightly in favor of transfer. In short, the Court finds that, given that the defendant allegedly committed the murders despite the stabilizing and deterring influences already in his life, the defendant's social background favors *578 transferring him to adult status. There is a substantial risk that, if the defendant is returned to the same family structure that he had at the time he joined the gang and allegedly participated in these murders after five years of incarceration (assuming arguendo that he received the statutory maximum), he would again choose to become part of a criminal organization and engage in new violent activity.
Third, the defendant's minimal juvenile record weighs against transfer, but as explained below, the Court finds that, in the instant case, after balancing all the statutory factors (including this one), transfer is in the interest of justice.
Fourth, as for the defendant's present intellectual development and psychological maturity, Dr. Goldsmith found that, although the defendant is immature, he has no intellectual limitations, met all of his developmental milestones within a normal time period, and has no sign of any major mental illness. The Court does not believe that his immaturity, brain development, and excessive use of marijuana adequately explain his alleged violent tendencies in this case (including his alleged premeditated, pivotal role in the murders). Moreover, Dr. Goldsmith acknowledged that the defendant was not coerced into joining the gang, but rather approached the gang himself and expressed interest in joining. Thus, the Court concludes that this factor weighs in favor of transfer.
Fifth, with respect to the nature of past treatment efforts and the defendant's response to those efforts, the Court notes that, although he has never been treated in a juvenile facility, the defendant did not respond well to treatment efforts that were made available to him in high school. In particular, when he began exhibiting negative behaviors in high school, the defendant was placed in a Community Reinvestment Program that was designed to steer him away from negative influences, such as marijuana use and gang association, and provide him with tools to be successful in school and strengthen his family relationships. This counseling program utterly failed to impact the defendant's behavior. In fact, it is alleged that he committed these murders while enrolled in the program, and such failed efforts certainly suggest that any future attempts at rehabilitation may not be successful. However, because the defendant has not had extensive treatment (such as formal treatment in a juvenile facility), the Court concludes that this factor only slightly favors transfer.
Finally, the availability of programs designed to treat the defendant's behavioral problems weighs against transfer.
In sum, although some factors weigh against transfer, they do not outweigh the other factors that, in combination, overwhelmingly favor transfer. As the Second Circuit has emphasized, "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.' " United States v. Nelson , 90 F.3d 636, 640 (2d Cir. 1996) (quoting United States v. J.D. , 525 F.Supp. 101, 103 (S.D.N.Y. 1981) ). The Sixth Circuit has similarly reasoned that "a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." United States v. T.F.F., A Juvenile Male , 55 F.3d 1118, 1121 (6th Cir. 1995) (quoting United States v. One Juvenile Male , 40 F.3d 841, 844 (6th Cir. 1994) ). Here, after analyzing all the factors with respect to the defendant, the Court concludes that there is no likelihood that the goals of the juvenile system will be achieved while the defendant is in juvenile custody and, under the particular circumstances of this case, "the concerns of public protection and punishment become *579 paramount." Nelson , 90 F.3d at 640. Although the Court found Dr. Goldsmith to be credible and thoughtful in his approach, his findings and overall conclusions are insufficient (when considered in light of the entire record and all the statutory factors) to provide the Court with any degree of confidence that any juvenile rehabilitation efforts would be successful and would adequately mitigate the extreme degree of danger and high risk of recidivism that the defendant would otherwise pose to society if he were to be kept in the juvenile system. In fact, when the Court asked Dr. Goldsmith to assess the likelihood that the defendant would successfully complete the juvenile programs and not pose a risk to society at age twenty-one, he acknowledged that he did not have enough information to make that assessment. In short, the Court concludes that the defendant's rehabilitation potential is low, and that the juvenile justice system is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these alleged violent crimes when considered in conjunction with the other statutory factors.
Accordingly, after thoroughly considering and weighing the statutory factors, the Court has determined in its discretion that treating the defendant as an adult in this case will serve the interest of justice.[2]
I. THE CHARGES [3]
The charges against the defendant stem from the government's continuing investigation *580 into the MS-13. (Gov't Mem. 2.) Since approximately 1998, MS-13 members on Long Island have engaged in street wars with rival gangs, which have resulted in the assault and murder of MS-13 and rival gang members, their family members, and innocent bystanders. (Id. at 2-3.) On induction into the MS-13, members agree to kill rival gang members whenever possible. (Id. at 4.)
The defendant, an alleged MS-13 member, is charged in connection with the murders of four suspected 18th Street Gang members. (Id. at 3-4, 6-7.) According to the government, the defendant was part of a conspiracy to lure the four victims to their deaths, and participated in carrying out the murders. (Id. at 6-8.) These murders were allegedly carried out because the MS-13 suspected that the victims and a fifth individual present that night, who fled the scene ("Surviving Victim"), were members of the rival 18th Street Gang and had falsely represented themselves to be MS-13 members. (Id. at 7.) The defendant participated in discussions and meetings in the weeks leading up to the April 11 murders, during which pictures of Surviving Victim flashing MS-13 hand signs were shared, and the defendant and his co-conspirators agreed to murder Surviving Victim. (Id. )
In furtherance of the conspirators' plan, on April 11, 2017, two juvenile females ("Juvenile Female 1" and "Juvenile Female 2") invited Surviving Victim to smoke marijuana in a wooded area near the Central Islip Recreational Facility. (Id. ) Surviving Victim accepted the invitation, and invited the four victims to join. (Id. )
Meanwhile, the defendant, along with other MS-13 members and associates, waited in the wooded area and prepared for the murders. (Id. ) The government alleges that, while waiting for Juvenile Female 1 and Juvenile Female 2 to bring the victims to their location, the defendant and the other MS-13 members and associates discussed the plan, divided up knives and machetes, and made clubs out of tree limbs. (Id. at 7-8.) The government further alleges that the defendant played a pivotal role in facilitating the attack, communicating by text message with Juvenile Female 1 and Juvenile Female 2 regarding their timing and location, which he then relayed back to the other MS-13 members and associates in order to time the attack. (Id. at 8.)
Shortly after Juvenile Female 1 and Juvenile Female 2 arrived at the predetermined location with Surviving Victim and the four victims, the defendant and the other MS-13 members and associates divided into groups, surrounded the victims, and ordered them to get on the ground and not move. (Id. ) Surviving Victim immediately ran away and escaped, but the defendant and other co-conspirators hacked and beat the four victims to death using the machetes, knives, and tree limbs. (Id. ) The defendant allegedly used a machete. (Id. )
According to the government, the MS-13 members and associates then dragged the victims' bodies a short distance and fled, concerned that Surviving Victim would alert the police to their location. (Id. at 8-9.) They allegedly planned to bury the bodies the following night. (Id. at 9.) Before they could do so, the Suffolk County Police Department discovered the bodies. (Id. )
The government filed a sealed Juvenile Information charging the defendant in connection with the April 11 murders on July 10, 2017, and an arrest warrant was issued *581 on July 12, 2017. (Id. at 3, 9.)[4] The defendant, however, had been taken into custody by Department of Homeland Security, Homeland Security Investigations agents on immigration charges in Virginia the month prior, on June 1, 2017. (Id. at 9.) Accordingly, on July 13, 2017, the day after the issuance of the arrest warrant, the defendant was transferred to the custody of the FBI's Long Island Gang Task Force and had an initial appearance in the Western District of Virginia, where he was ordered to be removed to the Eastern District of New York in connection with these charges. (Id. ) The defendant was arraigned in this Court on August 7, 2017.
II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER
"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." United States v. Nelson (Nelson I ), 68 F.3d 583, 588 (2d Cir. 1995) (quoting 18 U.S.C. § 5032 ).[5] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the alleged offenses; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavioral problems. See 18 U.S.C. § 5032 ; Nelson I , 68 F.3d at 588. Given the presumption in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. See, e.g. , Nelson I , 68 F.3d at 588 ; United States v. Doe , 49 F.3d 859, 868 (2d Cir. 1995).
Although the Court must evaluate each factor identified in Section 5032, it need not afford each factor equal weight, and "may balance the factors in any way that seems appropriate to it." Nelson I , 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing th[at] factor more heavily than the other statutory factors." Id. at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder." Id.
In weighing the factors, "the district court must keep in mind that 'permeating the transfer decision and the six-factor inquiry is the notion of rehabilitation.' " United States v. Ramirez , 297 F.3d 185, 193 (2d Cir. 2002) (quoting United States v. Nelson (Nelson II ), 90 F.3d 636, 640 (2d Cir. 1996) ). Indeed, "[r]ehabilitation clearly is one of the primary purposes *582 of the juvenile delinquency provisions," Nelson II , 90 F.3d at 640 (quoting Nelson I , 68 F.3d at 590 ), and "the statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential," id.
Even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," that potential "must be balanced against 'the threat to society posed by juvenile crime.' " Id. (quoting United States v. J.D. , 525 F.Supp. 101, 103 (S.D.N.Y. 1981) ). Accordingly, a "glimmer of hope" for a juvenile's future treatment prospects is insufficient to prevent transfer. Nelson I , 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." Nelson II , 90 F.3d at 640.
III. ANALYSIS OF FACTORS
A. Age and Social Background
1. Age
The Second Circuit has instructed that a district court should consider a juvenile defendant's age both at the time of the alleged offense and at the time of the transfer hearing. See Nelson I , 68 F.3d at 589 (finding that district court correctly considered juvenile's age at the time of the offense, but erred in not also considering juvenile's age at the time of the transfer hearing). As for the juvenile defendant's age at the time of the alleged offense, "a crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." United States v. C.F. , 225 F.Supp.3d 175, 184 (S.D.N.Y. 2016) (citing Doe , 49 F.3d at 867 ). The juvenile defendant's age at the time of the transfer hearing "is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate," considering the older a juvenile defendant is, "the harder it becomes to reform the juvenile's values and behavior." Nelson I , 68 F.3d at 589 (citations omitted). Accordingly, the older a juvenile defendant is both at the time of the alleged offense and at the time of the transfer hearing, the more the juvenile defendant's age weighs in favor of transfer. See, e.g. , C.F. , 225 F.Supp.3d at 184 ; United States v. A.O. , No. 15 Cr. 608-10 (KPF), 2016 WL 4197597, at *5 (S.D.N.Y. Aug. 8, 2016) (collecting cases); United States v. Doe , 145 F.Supp.3d 167, 183 (E.D.N.Y. 2015) (collecting cases).
The defendant, born on May 1, 2001, was fifteen years, eleven months old at the time of the April 11 murders and seventeen years, two months old at the time of the transfer hearing. (Gov't Mem. 3-4.) The defendant's age at the time of the alleged crimes weighs against transfer. See, e.g., United States v. Juvenile Male , 844 F.Supp.2d 333, 339 (defendant's age of 16 years, 3 months at time of alleged murder weighed against transfer). The defendant's current age, however, weighs slightly in favor of transfer. Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's age of seventeen years, two months at the time of the transfer hearing, which would allow him at most five years to rehabilitate himself, see 18 U.S.C. § 5037(c) (prescribing maximum detention terms for juveniles found to be juvenile *583 delinquents), weighs slightly in favor of transfer. See Nelson I , 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (citation omitted) ); United States v. Juvenile Male , 554 F.3d 456, 468-69 (4th Cir. 2009) ("In analyzing the first factor .... we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer.").[6]
Further, even if the Court were to disregard the defendant's current age and limit its analysis of the defendant's age to his age at the time of his alleged participation in the April 11 murders, it would still conclude that transfer is warranted in the interest of justice after balancing all the Section 5032 factors (including age) for the reasons discussed herein.
2. Social Background
The Court concludes that the defendant's social background weighs in favor of transfer.
The defendant was born in a small, rural town in El Salvador, where he was raised primarily by his maternal grandmother. (Goldsmith Rep. 2.)[7] The defendant has never met or spoken to his father, who left his mother before he was born. (Id. ) The defendant's mother emigrated to the United States when he was three years old, leaving the defendant and his older sister under the care of her mother. (Id. ) The defendant occasionally spoke with his mother by telephone, but he reported that such conversations were infrequent, brief, and that he felt "embarrassed" if he spoke with her for too long. (Id. )
According to Dr. Goldsmith, the defendant's grandmother appeared "competent and in a good state of health to parent her grandchildren." (Id. at 3.) The defendant's grandmother "enforced rules," "was concerned about the children being exposed to negative influences and gang violence," and took the defendant and his sister to church services. (Id. ) Moreover, for much of his childhood, the defendant was well-behaved, followed his grandmother's rules, and did well in school. (Id. ) The defendant reported that he had no history of social or behavioral issues, got along with his peers, *584 passed his classes, and played soccer almost every day. (Id. ) The defendant also did not report any history of physical or sexual abuse. (Tr. 18.)[8]
The defendant, however, started acting defiant as he got older. The defendant's mother reported that the defendant began acting out at age eight, and that he became more defiant by his early teenage years. (Goldsmith Rep. 3.) The defendant reported that he began smoking cigarettes at age twelve, and that he also smoked marijuana and tried alcohol, but denied regular use of both. (Id. )
Around this time, when the defendant was twelve years old, the MS-13 arrived in the defendant's community. (Id. ) The defendant denied any formal involvement with the MS-13 while living in El Salvador, but he reported casual interactions with the gang and "feeling that joining a gang was going to be inevitable, as those who didn't join were victimized." (Id. at 3-4.) The defendant also reported that, after the arrival of the MS-13, his community became more violent. (Id. at 4.) More specifically, the defendant's cousin's husband was killed by gang members, an individual associated with the defendant's soccer league disappeared, and the defendant witnessed fights between the MS-13 and the police. (Id. ) In light of the defendant's increasingly defiant behavior and the growing violence in his community, the defendant reported that his mother and grandmother decided that it would be in his best interest to join his mother in the United States. (Id. )
The defendant made the journey to the United States during the summer of 2015, when he was fourteen years old. (Id. ) The defendant described the trip as traumatic-at times, he was transported in hot shipping containers and trucks, crowded to the point where he felt like he could not breathe, and at one point he had to run from immigration officials and hide in a trough. (Id. ) After arriving in the United States, the defendant experienced frequent nightmares about his journey and had difficulty being in hot areas; however, he reported that he no longer suffered from these symptoms when he met with Dr. Goldsmith. (Id. )
Upon arriving in the United States, the defendant was taken into custody by immigration officials. (Id. ) The defendant was thereafter sent to New York, where he stayed in a group home for approximately one month, and then moved in with his mother, his mother's partner, his mother's partner's grandmother, and his half-sister in an apartment in Central Islip. (Id. ) The defendant's mother reported that the defendant initially "appeared in good spirits and was cooperative." (Id. ) The defendant did well his first year in school and enjoyed going to the soccer fields with his mother's partner; however, the defendant's mother also noted that the defendant became frustrated and would withdraw from school when he became overwhelmed with its demands. (Id. ) The defendant, in contrast, described his transition to the United States as more difficult. (Id. at 5.) The defendant found the school environment overwhelming and the work challenging, particularly because he did not speak English. (Id. ) The defendant also described feeling estranged from his mother, stating to Dr. Goldsmith that he "did not know her" and that "it was weird." (Id. ) Instead of bonding with his mother, the defendant became close with his cousin, a member of the MS-13 in El Salvador who had arrived in the United States a week before the defendant. (Id. )
*585 In the spring of 2016, during the second half of the defendant's eighth grade year, the defendant began to get in trouble at school for disruptive behavior and truancy. (Id. ) The defendant's pattern of disruptive behavior and truancy became more aggravated when he started high school. (Id. at 6.) By December of his freshman year of high school, the defendant had received "20 full days truancy and 12 days of partial truancy." (Id. )
As a result of the defendant's truancies, Central Islip High School referred the defendant to the Suffolk County Probation Department. (Gov't Mem. 12.) Probation subsequently referred the defendant to the Community Reinvestment Program ("CRP"), "a diversion program which counsels at-risk youth," to address his marijuana use and equip him with the tools necessary to succeed in school, strengthen his family relationships, and avoid gangs. (Id. at 12-13.)
The defendant and his mother were evaluated by and received counseling from CRP in February 2017. (Id. at 13; Goldsmith Rep. 6.) A CRP report issued that month described the distant relationship between the defendant and his mother, as well as the defendant's disobedience at home. (See generally CRP Rep., Gov't Ex. 12.)[9] The report also reflects that the defendant was initially receptive to counseling, stating that after "CRP opened [the defendant's] case, [the defendant] has made efforts to attend school and follow school rules. In a short period, the school recognized [the defendant's] efforts and sent a postcard disclosing that he has improved his attitude." (Id. at 5.) This positive response to counseling, however, was short-lived. In the three months following counseling, the defendant was suspended from school for fifteen days and is alleged to have participated in the April 11 murders. (Goldsmith Rep. 6.)
With respect to the defendant's membership in the MS-13, the defendant reported to Dr. Goldsmith that he joined the MS-13 approximately one month after arriving in the United States. (Goldsmith Rep. 5.) The defendant was introduced to members of the MS-13 by his cousin; however, he "maintain[ed] that he approached MS-13 representatives and expressed interest [in joining the gang]" (id. at 9), and did not report being coerced to join (see Tr. 26). The defendant explained that he joined the MS-13 because (1) he felt "more at ease" with youths from El Salvador who were in the MS-13 than with his mother; (2) he desired respect, and believed that the community respected the MS-13 (referencing the fact that the gang was prominent in popular culture and the news); and (3) it would "allow him easier access to friends, women, and marijuana." (Goldsmith Rep. 5.) The defendant joined the MS-13 as a "paro," the lowest rank in the gang. (Id. at 7.) He understood that he needed to murder a member of a rival gang in order to be promoted (id. ), and the defendant wanted to be promoted within the gang (see Tr. 32).
The parties disagree as to whether the defendant's social background supports transfer. Defense counsel argues that the defendant's social background weighs against transfer because it demonstrates that the defendant "never had the benefit of a normal upbringing nurtured by love" (Def. Opp. 3), and that the defendant's association with the MS-13 was inevitable-the defendant's difficult journey and transition to the United States and detached *586 relationship with his mother were destabilizing forces that "left him vulnerable to dangerous influences" like the MS-13 (id. at 3-4 (quoting Goldsmith Rep. 9) ). The government argues that the defendant's social background favors transfer because it appears that the defendant had a stable upbringing, with parental figures that made efforts to keep the defendant out of trouble. Despite those efforts, the defendant alienated himself from his family and instead chose to join the MS-13, where he embraced the gang's violent culture and played a significant role in the April 11 murders.
The Court concludes that the defendant's social background, taken in its entirety, suggests a low likelihood of rehabilitation within the short period of time before his release if convicted as a juvenile[10] for the following reasons.
First, the Court disagrees with defense counsel's characterization that the defendant "never had the benefit of a normal upbringing nurtured by love." (Def. Opp. 3.) Instead, without discounting the defendant's difficult journey and transition to the United States, the defendant appears to have had a fairly stable and supportive family environment in both El Salvador and the United States. By all accounts, the defendant had a good relationship with his grandmother and a positive upbringing in El Salvador. (See Goldsmith Rep. 3; CRP Rep. 1.) The defendant's grandmother enforced rules and took the defendant to church services, and the defendant did well in school, got along with his peers, and played soccer almost every day. (Goldsmith Rep. 3.) Dr. Goldsmith testified that, based on his conversations with the defendant and the defendant's mother, it appears that the defendant's grandmother "was a strong woman and had done a good job of parenting [the defendant] up until age 14 in the context of poverty and challenges that were present in his neighborhood in El Salvador." (Tr. 19-20.) Although, even when living in the United States, the defendant felt estranged from his mother, this appears to have been due to a decade of separation, rather than a lack of care or love. (See CRP Rep. 1 ("Although both [the defendant and his mother] care for each other, both ... are in the beginning stages of learning more about each other.").) Indeed, the defendant's mother and grandmother arranged for the defendant to come to the United States out of concern for his safety and well-being in El Salvador. (Goldsmith Rep. 4; Tr. 21-22.) Moreover, there are no allegations that the defendant's mother abused or neglected him-to the contrary, as noted by Dr. Goldsmith, "[s]he tried to step in to be a parent.... [S]he had her boyfriend ... spend time with [the defendant] as well in an attempt to, of course, bring him into the family." (Tr. 28.) The defendant, however, "seemed to resist those efforts." (Id. )
Second, although the Court recognizes that arriving in the United States at age fourteen and with no strong family bonds could leave one vulnerable to gang influences, this does not appear to be what drove the defendant to join the MS-13. Instead, the record reflects that the defendant sought out the MS-13 gang and was an active, willing participant in its violent culture. Indeed, the defendant maintains that he approached the MS-13 to the join *587 the gang (1) fully aware of its violent nature based on his experience in El Salvador (Goldsmith Rep. 4; Tr. 23); (2) despite the fact that he knew that his family brought him to the United States to avoid the gang's influence (Goldsmith Rep. 4; Tr. 23-24); and (3) for superficial, self-interested reasons-namely, respect, girls, soccer, and marijuana (Goldsmith Rep. 5). Further, after joining the MS-13, the defendant is alleged to have actively participated in the April 11 murders with the understanding that he would be promoted within the gang. (Gov't Mem. 8; Tr. 32-33.)
Third, insofar as the defendant's participation in criminal conduct for the MS13 can be explained by his lack of strong family bonds in the United States, the fact that the defendant would return to the same environment following his release indicates that rehabilitation as a juvenile is unlikely.[11] Indeed, when Dr. Goldsmith was asked at the transfer hearing whether there was a strong likelihood that the defendant would revert to criminal behavior if returned to the same environment following treatment in a juvenile facility, Dr. Goldsmith responded that this was "a very difficult question to answer" and that he "really can't give an answer to that." (Tr. 29.) Similarly, when the Court asked Dr. Goldsmith to assess the likelihood that the defendant would successfully complete juvenile programs and not pose a risk to society at age twenty-one, Dr. Goldsmith stated that he did not have enough information to answer that question, but that if the defendant did not receive continued services and monitoring, "his risk factors for recidivism would be higher." (Id. at 57-58.)
In sum, after considering all of these factors, the Court finds, overall, a low likelihood of rehabilitation where the defendant had a relatively stable and supportive family environment, rejected that environment in favor of the MS-13, willfully embraced the gang's violent culture (including by actively participating in the April 11 murders), and would return to the same family structure that apparently was insufficient to deter the defendant from such violent behavior upon his release. See United States v. Robinson , 404 F.3d 850, 859 (4th Cir. 2005) ("Although Robinson's early years with his mother were not pleasant ..., Robinson had been provided with a loving home for eight years prior to committing the crimes in question. We believe this factor weighed in favor of a transfer."); Juvenile Male , 844 F.Supp.2d at 340 (defendant's social background favored transfer because, "despite the defendant's stable, loving home life and his mother's efforts to prevent him from engaging in criminal activity, the defendant nevertheless allegedly chose to join a gang"); United States v. Juvenile (I.H., Jr.) , 1 F.Supp.2d 509, 518 (D.V.I. 1998) ("It must also be considered that [the defendant] having come from a stable home and yet having done these terrible acts likewise weigh in favor of transfer.").
Accordingly, although the defendant's age at the time of the alleged crimes weighs against transfer, the Court concludes that his social background favors transfer (along with his chronological age).
*588 B. Nature of the Alleged Offenses
As an initial matter, the Court notes that, in considering this factor, it must assume that the defendant committed the offenses charged and abstain from examining the strength of the government's evidence. See, e.g., United States v. Sealed Defendant , 714 F. App'x 65, 67 (2d Cir. 2018) ("[T]he district court correctly assumed, for purposes of the transfer hearing, that the government's allegations against B.M. are true."); Nelson I , 68 F.3d at 589 ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information."). Additionally, as explained above, the Court may weigh this factor more heavily than any other when the alleged offense is particularly serious. See, e.g., Ramirez , 297 F.3d at 193 (quoting Nelson I , 68 F.3d at 590 ).
Here, the seriousness of the alleged offenses cannot be overstated. The defendant is charged with four heinous, premeditated murders carried out for the MS-13. The defendant and other MS-13 members and associates allegedly conspired to lure the victims to a prearranged location in the woods, and then viciously attacked them when they arrived (the defendant using a machete), killing four of the five victims. Moreover, the government further alleges that the defendant was actively involved in the planning and coordination of the April 11 murders. The defendant allegedly participated in preparation meetings in the weeks leading up to the murders and, on the evening of the murders, served as the contact between Juvenile Female 1 and Juvenile Female 2 and the other members of the MS13 in order to facilitate the timing and location of the attack.
Given the extraordinary severity of the alleged crimes, the Court finds that this factor weighs strongly in favor of transfer, and gives this factor more weight than any other.[12] Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as-or even less serious than-the crimes alleged here. See e.g., United States v. Wilson , 149 F.3d 610, 614 (7th Cir. 1998) (district court was "within its discretion to give more weight to the nature of the alleged offense than to the other factors" where defendant was charged with distributing cocaine and crack and had allegedly "brandished a gun and expressed a willingness to use it" in the course of that distribution); United States v. One Juvenile Male , 40 F.3d 841, 845-46 (6th Cir. 1994) (district court did not abuse its discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant *589 shot and killed a car's passenger, "outweighed any factors that supported trying defendant as a juvenile"); United States v. A.R. , 38 F.3d 699, 705 (3d Cir. 1994) ("A.R. attacks th[e] [district court's] weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); United States v. Hemmer , 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); A.O. , 2016 WL 4197597, at *7 (nature of alleged offense was most important factor and weighed in favor of transfer where juvenile defendant was charged with the intentional shooting of two people, the reckless shooting of several others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses); United States v. Doe #1 , 74 F.Supp.2d 310, 321 (S.D.N.Y. 1999) (although majority of factors weighed against transfer, transfer was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior").
C. Nature and Extent of Any Prior Delinquency Record[13]
The parties agree that the defendant's limited criminal history-specifically, one misdemeanor conviction for prohibited occupancy, in violation of a Town of Islip Ordinance (Gov't Mem. 10)[14] -weighs against transfer, and the Court reaches the same conclusion. However, the Court notes that, even the absence of a prior delinquency record does not preclude the transfer of a defendant to adult status when, as in this case, a balancing of all the statutory factors weighs in favor of transfer. See, e.g., United States v. Sealed Appellant 1 , 591 F.3d 812, 822 (5th Cir. 2009) (affirming district court's decision to transfer juvenile to adult status despite lack of a prior juvenile record); Juvenile Male , 554 F.3d at 468-70 (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background).
*590 D. Present Intellectual Development and Psychological Maturity
"This factor seeks to gauge, through an examination of the juvenile's present intellectual development and his psychological maturity, the juvenile's moral culpability and his capacity for rehabilitation." C.F. , 225 F.Supp.3d at 195. Generally, a juvenile defendant's "present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." A.O. , 2016 WL 4197597, at *7 (citing Juvenile Male , 844 F.Supp.2d at 345-46 ); see also United States v. A.A.D. , 106 F.Supp.3d 272, 277 (D.P.R. 2015) ("Transfer to adult status is less favored for juveniles who exhibit low intellectual development and stunted psychological maturity because they are viewed as less responsible for their conduct." (citing J.D. , 525 F.Supp. at 103-04 ) ).
The record supports that the defendant has at least average intelligence for his age. According to Dr. Goldsmith, the defendant does not appear to have any intellectual limitations and did not experience any developmental delays. (Goldsmith Rep. 7, 10.)[15] Dr. Goldsmith conducted a mental status examination of the defendant, reporting that the defendant's "attention and concentration were adequate," "there was no indication of any cognitive limitations," "[h]is thought process appeared organized," and "there was no indication of any sort of thought disorder or hallucinations." (Id. at 7.)
The record is more mixed regarding the defendant's psychological maturity. On one hand, Dr. Goldsmith reported that the defendant met all developmental milestones and was "not suffering from any appreciable sign of major mental illness." (Id. at 10.) In addition, in connection with the mental status examination, Dr. Goldsmith reported that the defendant "appeared his stated age," "was calm and cooperative," and "appeared to make a good effort to be honest and forthcoming." (Id. at 7.) On the other hand, Dr. Goldsmith reported that the defendant "appears to be immature for his age" and "likely has executive function problems involving judgment and decision making" due to his excessive marijuana use. (Id. at 10.) More specifically, Dr. Goldsmith reported that, during the evaluation, the defendant "displayed very little emotional range" (id. at 7), had the same "facial expressions and tone ... when discussing both good and bad memories" (id. ), and "seemed less anxious and distressed than would usually be expected, given the gravity of his charges" (id. at 10), which Dr. Goldsmith found could be due to the defendant's immaturity (id. at 8, 10). Dr. Goldsmith further reported that the defendant's immaturity was manifested in "his difficulty understanding or expressing his motivations for his behaviors ..., the superficiality with which he views his current situation, ... the self-involved way in which he frames the events leading to his arrest, and his difficulty in considering the ways in which his actions are likely to impact others." (Id. at 10.) Dr. Goldsmith also diagnosed the defendant with Oppositional Defiant Disorder, Adolescent Anti-Social Behavior, and Cannabis Use Disorder, the last of which Dr. Goldsmith reported is demonstrated to have negative effects on the adolescent developing brain, "resulting in problems with planning, judgment, decision making and personality." (Id. at 8, 10.)
*591 Upon review of the record, although the Court found Dr. Goldsmith to be a credible and thoughtful witness, the Court concludes that Dr. Goldsmith's findings regarding the defendant's immaturity and executive function issues are of limited significance in the context of this motion for several reasons.
First, although Dr. Goldsmith reported that the defendant's detached affect could be attributed to immaturity, he agreed at the transfer hearing that the defendant's demeanor "would [also] be consistent with not having remorse." (Tr. 41.) Moreover, the defendant did not express any remorse for the April 11 murders when meeting with Dr. Goldsmith, even when discussing the events of that day. (See id. at 37-42.) Accordingly, without a more definitive finding from Dr. Goldsmith regarding the defendant's level of maturity, the Court is unable to conclude whether the defendant's behavior reflects immaturity or simply a lack of remorse and, therefore, does not find that this assessment by Dr. Goldsmith meaningfully weighs against transfer.
Second, the Court accepts Dr. Goldsmith's diagnoses of the defendant, including the detrimental effects that Cannabis Use Disorder can have on the adolescent developing brain. The Court, however, finds that the defendant's excessive marijuana use and/or immaturity cannot explain his alleged horrific crimes. As the government correctly asserts:
[T]he poor decisions or lack of judgment demonstrated by the defendant are not related to minor offenses, sudden outbursts of emotion, or other anti-social behavior often seen in young adults which can be easily attributed to marijuana abuse, a youthful lack of impulse control or emotional and psychological immaturity.... Marijuana use cannot explain his attraction to the gang or his unrepentant role in the gruesome murders for which he is charged.
(Gov't Reply 4.) Dr. Goldsmith also testified at the hearing that the defendant's marijuana use "can be used only as some [clinical] insight and understanding into [the defendant's] capacity to think more abstractly and make judgments. It does not explain the ultimate decision of the participant." (Tr. 44.) Dr. Goldsmith agreed with the government at the hearing that "the defendant himself joined the [MS-13] and participated in these crimes because he wanted to" (id. ), and further testified that there was "no indication ... that [the defendant] is someone that doesn't know right from wrong" (id. at 43). In short, the extreme, violent nature of these alleged murders (and the defendant's alleged extensive role in them) simply cannot be fully attributed to any poor judgment or decision making caused by excessive marijuana use or other factors.
Third, although Dr. Goldsmith identified no impediments to rehabilitation (id. at 57), Dr. Goldsmith did not opine that the defendant would be a successful candidate for rehabilitation if adjudicated as a juvenile. Instead, Dr. Goldsmith concluded that, "[i]f [the defendant] is able to successfully complete the treatment, educational and vocational components of [a] juvenile residential treatment program, his risk of recidivism would be significantly reduced." (Goldsmith Rep. 11.) As discussed in connection with other factors, the Court is not persuaded that the defendant is likely to be successful in rehabilitation. Moreover, even if his risk of recidivism were "significantly reduced" after successfully completing treatment, the Court is concerned that it would not be reduced to such an extent as to adequately protect the public given that the defendant's current risk of recidivism is extremely high.
*592 In sum, the Court finds that, on balance, this factor weighs in favor of transfer. The defendant clearly understood the ramifications of joining the MS-13 gang and participating in these murders, and made a deliberate decision to do so. Put simply, despite any psychological immaturity, the defendant clearly has the cognitive ability to conform his conduct to the law. See, e.g. , United States v. A.R. , 203 F.3d 955, 962 (6th Cir. 2000) ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law." (citing One Juvenile Male , 40 F.3d at 845 ) ).[16]
E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts
As discussed in connection with the defendant's social background, the defendant received some counseling with a CRP therapist.
Despite initial reports that the defendant was receptive to the therapy, the CRP counseling proved unsuccessful. In the three months following counseling, the defendant was suspended from school for fifteen days and is alleged to have participated in the April 11 murders. (Goldsmith Rep. 6.) Dr. Goldsmith also reported that the defendant "concealed the extent of his gang involvement from his counselor." (Id. at 10.)
The defendant's failed experience with CRP counseling evidences that the defendant has not responded positively to treatment in the past, and that he is not a strong candidate for rehabilitation. Accordingly, this factor weighs in favor of transfer. The Court, however, weighs this factor only slightly in favor of transfer given that the CRP counseling was limited, and recognizing that, as discussed in connection with the final factor, the defendant would have access to more extensive treatment if he were adjudicated as a juvenile.
F. Available Programs Designed to Treat the Juvenile's Behavioral Problems
Under this factor, the government bears the burden of establishing a lack of available programs designed to treat the juvenile's behavioral problems. See, e.g., Nelson I , 68 F.3d at 591.
The government concedes that this factors weighs against transfer, and the Court agrees. According to the government, although there apparently are no federal facilities for individuals adjudicated as juveniles (Gov't Mem. 20), the Bureau of Prisons currently has contracts with three juvenile detention facilities-Abraxas Academy in Morgantown, Pennsylvania; Garza County Juvenile Regional Center in Post, Texas; and Juvenile Services Center in Rapid City, South Dakota-where individuals adjudicated as juveniles or defendants transferred to adult status who are still under the age of eighteen are designated (Aug. 1, 2018 Gov't Letter).[17] These facilities are mandated to provide certain treatment programs, including, among others, individualized and group educational programming, psychiatric counseling, vocational training, and substance abuse counseling. (Id. ) Accordingly, given the availability of juvenile facilities with mandated treatment programs designed to treat the *593 defendant's behavioral issues,[18] as well as the absence of any evidence regarding the availability of equal or better adult facilities, the government has not met its burden on this factor and it weighs against transfer.[19]
* * *
In sum, after carefully balancing all the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. The defendant is charged with four murders in connection with his alleged participation in the violent activity of the MS-13 street gang. These are precisely the types of serious, violent crimes that weigh strongly in favor of transfer. In addition to the gravity of the alleged crimes, other factors-including, inter alia , the defendant's current age and intelligence, his decision to join the MS-13 (despite preventive efforts by his family) and alleged extensive role in the April 11 murders, and the fact that previous counseling failed-collectively demonstrate that the defendant is not likely to be rehabilitated within the juvenile system if he is convicted of the charged crimes as a juvenile and provided with juvenile rehabilitation programs. Accordingly, although some factors favor a denial of the transfer motion, the Court finds that the defendant's rehabilitation potential within the juvenile justice system is low after balancing all the statutory factors.
As noted above, the Second Circuit has made clear that "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.' " Nelson II , 90 F.3d at 640 (quoting J.D. , 525 F.Supp. at 103 ). Accordingly, given that the crimes charged here are extremely violent and the threat to society posed by these crimes is at the highest level, as well as the fact that the overall record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.
IV. CONCLUSION
For the reasons explained above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.
SO ORDERED.

Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. 18 U.S.C. § 5038(e). In order to comply with this provision and Section 5038's other provisions requiring the confidentiality of juvenile records, the Court determined that these proceedings and all related documents should be sealed.

This Court has previously transferred other juveniles to adult status for their alleged participation in violent acts for the MS-13. See generally, e.g., United States v. Juvenile Male , No. 17-CR-367 (JFB), 316 F.Supp.3d 553, 2018 WL 3031842 (E.D.N.Y. June 19, 2018) (defendant was seventeen years, ten months old at time of his alleged participation in the April 11 murders); United States v. Juvenile Female , No. 17-CR-362 (JFB), 313 F.Supp.3d 412, 2018 WL 2846558 (E.D.N.Y. June 11, 2018) (defendant was seventeen years, four months old at time of her alleged participation in the April 11 murders); United States v. Juvenile Male , 269 F.Supp.3d 29 (E.D.N.Y. 2017) (defendant was sixteen years, six months old at time of alleged attempted murder of a rival gang member, and sixteen years, eleven months old at time of alleged murder of an MS-13 member suspected of cooperating with law enforcement and of being gay); United States v. Juvenile Male , No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was seventeen years, ten months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); United States v. Juvenile Male , No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was sixteen years, seven months old at time of alleged attempted murder of a sixteen-year-old male, and seventeen years, eight months old at time of alleged murder of another individual); United States v. Juvenile Male , No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was seventeen years, four months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); United States v. Juvenile Male , 844 F.Supp.2d 333 (E.D.N.Y. 2012) (defendant was sixteen years, three months old at time of alleged murder of a fifteen-year-old); United States v. Juvenile Male No. 2 , 761 F.Supp.2d 27 (E.D.N.Y. 2011) (defendant was sixteen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son); United States v. Juvenile Male , 844 F.Supp.2d 312 (E.D.N.Y. 2011) (defendant was seventeen years, six months old at time of two alleged attempted murders); United States v. Juvenile Male , 754 F.Supp.2d 569 (E.D.N.Y. 2010) (defendant was seventeen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son).

The allegations set forth herein are drawn from the government's motion papers. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." United States v. Nelson , 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

Other alleged MS-13 members and associates have been indicted or charged in sealed Juvenile Informations in connection with the April 11 murders in federal court in the Eastern District of New York. (Gov't Mem. 9.)

In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that ... the offense charged is a crime of violence that is a felony ... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the then-acting United States Attorney for the Eastern District of New York, acting pursuant to the authority delegated to her by the Attorney General.

In opposing the motion, defense counsel notes that the defendant "appears to be the youngest defendant yet to be prosecuted for MS-13 murders." (Def. Opp. 1.) Although defense counsel is correct that the defendant appears to be the youngest juvenile defendant that the undersigned has considered for transfer to adult status under 18 U.S.C. § 5032, seesupra note 2, the Court notes that courts in various circuits (including the Second Circuit) have transferred to adult status juvenile defendants who were younger than the defendant when they allegedly committed the charged crimes, including for alleged crimes less egregious than those charged here. See, e.g., United States v. Sealed Defendant , 714 F. App'x 65, 66-67 (2d Cir. 2018) (affirming transfer of defendant who was fifteen years old at time of arrest for alleged shootings of rival gang members that resulted in four individuals being seriously injured); United States v. Sealed Appellant 1 , 591 F.3d 812, 820-22 (5th Cir. 2009) (affirming transfer of defendant who was fifteen years, four months old at time of alleged carjackings); United States v. Male Juvenile E.L.C. , 396 F.3d 458, 460-63 (1st Cir. 2005) (affirming transfer of defendant who was fifteen years, nine months old at time of alleged murder of federal officer in an attempt to perpetrate an armed robbery); United States v. Juvenile No. 1 , 118 F.3d 298, 311-12 (5th Cir. 1997) (affirming transfer of defendant who was fifteen years, six months old at time of his alleged participation in violent armed robberies); United States v. Jerry Paul C. , 929 F.Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant who was fifteen years old at time of alleged murder).

Citations to "Goldsmith Rep." refer to the June 22, 2018 psychiatric report prepared by Dr. Eric Goldsmith, the forensic psychiatrist retained by defense counsel to conduct a psychiatric evaluation of the defendant in connection with this motion.

Citations to "Tr." refer to the transcript of the July 19, 2018 hearing on this motion. Dr. Goldsmith was the only witness that testified at the hearing.

The defendant reported the same to Dr. Goldsmith-that he was bored by school, was smoking marijuana on a daily basis (and often multiple times a day), and would stay out late and refuse to abide by his mother's instructions when he returned home. (Goldsmith Rep. 7.)

The government asserts that the defendant would be transferred to an adult facility when he turned twenty-one if he were found guilty of the charged offenses as a juvenile. (Aug. 1, 2018 Gov't Letter.) Even assuming that the defendant could remain in a juvenile detention facility the maximum sentence if treated as a juvenile (namely, at most five years), the Court finds that it is unlikely that the defendant would successfully rehabilitate in that time.

Defense counsel asserts that this case has strengthened the defendant's bond with his mother, and that the defendant's mother has learned from this experience and is supportive of the defendant. (Def. Opp. 7; see also Tr. 58-59.) The Court, however, does not find this shift in their relationship significant enough to meaningfully weigh against transfer, particularly given the fact that the defendant's mother-albeit apparently lacking the necessary judgment and skills to successfully supervise the defendant at the time (Goldsmith Rep. 6)-attempted to both bond with and parent the defendant prior to his arrest, and the defendant rejected such efforts.

Defense counsel argues both that "the brutal nature of the murders should not be the prime focus of determining whether juvenile treatment should be rejected" (Def. Opp. 1) and that "[t]he brutal murders should be treated as a neutral factor" because studies show that juveniles' brains are undeveloped, and the defendant's brain development was impaired by his excessive marijuana use (id. at 4). The Court disagrees. First, as explained above, it is well settled in the Second Circuit that when, as in this case, "a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." Nelson I , 68 F.3d at 590. Second, although the Court recognizes that the defendant's development and marijuana use are relevant to the Court's overall analysis (specifically, the defendant's age and social background, as well as his present intellectual development and psychological maturity), they do not bear on this factor. Moreover, for the reasons discussed herein, the Court concludes that, after balancing all six statutory factors (and considering defense counsel's arguments in the context of the entire record), transfer is warranted in the interest of justice.

There is a circuit split as to whether this factor is limited to convictions, or encompasses unadjudicated conduct like prior arrests. Compare Wilson , 149 F.3d at 613, with United States v. Juvenile LWO , 160 F.3d 1179, 1183 (8th Cir. 1998). The Second Circuit has not directly addressed the issue, and this Court need not resolve this question here because the Court is only considering the defendant's sole prior conviction and, in any event, concludes that it does not support transfer.

At the hearing, the government attempted to admit a Suffolk County Jail incident report about a fight allegedly involving the defendant as evidence of the defendant's continued allegiance to the MS-13 and his proclivity for violent and criminal behavior. (Tr. 4-7.) The Court, however, agreed with defense counsel that, absent witness testimony or additional evidence, the report alone was insufficient to support the government's arguments. (Id. at 4-6, 8.) The government thereafter withdrew its request to move the exhibit into evidence. (Id. at 8.) Accordingly, the Court has not considered the defendant's alleged involvement in a Suffolk County Jail fight in connection with this factor or any other factor in reaching its determination.

Although the defendant failed several classes in eighth and ninth grade, Dr. Goldsmith reported that "these failures appear to be the result of poor attendance and effort rather than intellectual limitations." (Goldsmith Rep. 10.)

The Court notes that, even if this factor weighed against transfer, the Court would still find that transfer is warranted after balancing all the Section 5032 factors.

As discussed supra at note 10, the government asserts that juvenile delinquent inmates are transferred to an adult facility at age twenty-one. (Aug. 1, 2018 Gov't Letter.) According to the government, juveniles convicted as adults are transferred to an adult facility at age eighteen. (Id. )

Dr. Goldsmith reported that the defendant would require substance abuse treatment, psychiatric therapy, and education and vocational training services. (Goldsmith Rep. 10.)

Although the Court finds that this factor weighs against transfer, the Court also finds that it does not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors overwhelmingly favors transfer.